Case number 23-3346, Marilyn Crossley v. Kettering Adventist Healthcare et al. Oral arguments about to exceed 15 minutes per side. Ms. Nelson, you will proceed for the appellant. Good morning, your honors. May it please the court. My name is Lindsay Nelson. I represent the plaintiff appellant, Marilyn Crossley. I would like to reserve three minutes for rebuttal. Go ahead. As you are aware, this is an employment discrimination action. We are here today because the district court improperly granted summary judgment in defendant's favor on Ms. Crossley's claims of age and disability discrimination under federal and Ohio law. Summary judgment is improper here for a variety of reasons, but I'm going to use my time this morning to highlight two main reasons. First, a tribal issue exists regarding pretext. And second, the honest belief doctrine does not foreclose Ms. Crossley's arguments demonstrating pretext. As to the first issue, Ms. Crossley offered 10 different points to demonstrate that the proffered reason for termination did not actually motivate defendant's decision to terminate. Each of these 10 reasons defendants explanations, but there are four highly compelling arguments. First, throughout this litigation, defendants have inconsistently identified policies that Ms. Crossley violated. Weren't they always saying there were HIPAA violations and then you were insubordinate? Kettering has claimed that, yes, but they've been unable to point to a specific policy within Kettering that Ms. Crossley violated. Does it matter that she violated three policies? Why does it matter that they have to point to... I thought your point was that they may have violated one, they may have violated the other, but I mean, why does it matter if her conduct was so egregious that it violated three separate policies that would make it seem more severe rather than less so? I think it matters here because in terms of demonstrating whether or not Kettering's... In terms of demonstrating pretext here, it matters whether they could consistently point to a policy. It's suggestive that their reason for terminating Ms. Crossley was pretext because they can't consistently identify a policy that she violated. Haven't they consistently said it was because she was looking into the schedules of the patients of other therapists? Hasn't there been a consistent basis for the termination? Yes, and we actually don't dispute that Ms. Crossley was accessing patient charts. The dispute here is whether that actually motivated defendant's decision to terminate her. There's a number of genuine disputes of fact here that challenge that motivation. And whether those, as it relates to around August of 2019, those other things that could have motivated that determination other than her accessing the schedules and things after she was told not to do so? Sure. So, in addition to Kettering being unable to consistently identify a specific policy that she violated, it's also unclear who made the decision to terminate Ms. Crossley. Here, Ms. Douglas testified that Ms. Isaac is the one that determined whether a HIPAA violation occurred. But Ms. Isaac testified that it actually wasn't up to her to determine whether a breach occurred. And she instead testified that corporate integrity, not her, determined whether a HIPAA violation occurred. Why not Kettering? The fact that no one at Kettering will take ownership over making the determination that Ms. Crossley violated policies severely undermines Kettering's position that it had a legitimate and lawful basis to terminate her. What about, didn't Ms. Sheldon take ownership in her affidavit where she said, I was the one that said Ms. Crossley should be fired and the type of conduct she engaged in? There's nobody else who had not been fired for engaging in that type of conduct? Ms. Sheldon, I believe she testified that she made a recommendation to terminate, but I don't believe that she took ownership as to making that final determination. Ms. Isaac testified that that ultimate determination, or I'm sorry, Ms. Douglas testified that that ultimate determination would be left to Ms. Isaac. Yeah, but I mean, Sheldon's affidavit did suggest if Isaac had decided not to terminate her, she would have gone up the chain and nearly demanded it. So she seemed pretty vocal in her affidavit, at least, that this was a pretty egregious violation of their policies concerning the confidentiality of patient information. I think the point, again, is that these inconsistencies and these disputes of fact, they undermine the motivation for the termination. And I think some of these disputes of fact are questions that should be left up for a jury, rather than just construing the evidence in Kettering's favor. Could she be fired simply for insubordination in that there was the meeting earlier in August where she was told that they were concerned about her HIPAA violations and that she should not be accessing patient files? And then a few days later, she is found to have accessed a patient file. Isn't that a ground for the insubordination claim? I think, again, here there's a dispute of fact because with Ms. Crossley's position, she is going to be accessing patient charts as part of her job. And Ms. Crossley testified that those other patient charts she accessed were as part of her job and for training purposes. And so, the fact alone that she accessed them is not a violation in itself. And there's a dispute of fact as to the reasoning for accessing those. I thought you said, though, that I thought your point about why the honest belief rule didn't apply is because you're readily acknowledging the facts that made up the conduct that caused her to be fired. Now, you're suggesting the facts are in dispute or you reconcile those two? So, we're admitting here that she accessed patient charts. There's no dispute as to that. We're arguing that the honest belief doctrine does not apply because we're not arguing that there's no basis in fact for the termination. And the honest belief doctrine only applies if we're arguing that there's no basis in fact at all. What are the facts? Sorry. Aren't you, in effect, arguing there's no basis when you say, well, she says she had a reason to access the files? We're not arguing that she did not access the files. There is a dispute here as to whether or not her conduct violated any policies. But as this court has done before in Babb versus Marysville Anesthesiologist, even if you accept that Kettering's reason for termination is, even if you accept that she violated policies here, we can still create a genuine issue of as to whether or not that conduct actually motivated Kettering to terminate Ms. Crosley. Don't you think, though, the honest belief would extend? So, you're saying it only applies to factual questions about what happened. But why wouldn't it extend to whether the facts that happened violated the policy? So, I know Ms. Crosley suggests that her conduct would not have violated their policies. But if they honestly and reasonably believe that it did, I don't see why we wouldn't extend the basic contours of the rule to that, whether you call it a fact or a legal conclusion about whether these facts violate this policy. It seems to me, as long as they have a good faith belief, it would trigger that honest belief rule. You seem to be wanting to narrow it just to kind of what she actually did. And I don't see a basis for that. I think that that would be applying the honest belief doctrine under this second prong for pretext, which this court has not done before. This court has only applied the honest belief doctrine under arguments that the defendants had no basis, in fact, for their termination. And here we're arguing that defendants, that the reason for termination did not actually motivate them. And this court has not applied the honest belief doctrine to bar those arguments. And in addition to whether or not Ms. Crosley violated these policies, we've presented evidence demonstrating that there are disputes of fact as to whether Kettering's reason actually motivated their termination. And as we discussed previously, some of those reasons are whether or they can consistently identify the policy she violated. Kettering has been unable to identify who made the determination to terminate Ms. Crosley. Kettering's policies are unclear and ambiguous. They acknowledge that employees are permitted to access patient information for operations activities, such as Kettering's own operations, care coordination, to review competence and qualifications of a healthcare professional and for training healthcare professionals. And defendants testified that they generally understand that employees are permitted to access patient information so long as they have a legitimate business reason for doing so. So none of these policies referenced by defendants only allow employees to access patient charts if the employee is directly actively treating those patients. And Ms. Crosley introduced an affidavit of a coworker, her name's Teresa Holman, who was told by her supervisor that she was permitted to access patient health information for scheduling, teaching, and patient continuity of care. So there's ambiguity here in Kettering's policies, which just further demonstrate that the Kettering's proffered reason didn't actually motivate their termination. What's your best case on that, under the actual motivation prong that supports your arguments here? There's Babb v. Marysville Anesthesiologists. And how is that analogous to this case? Because in Babb v. Marysville Anesthesiologists, the plaintiff there was terminated for clinical errors, and she disputed whether or not she actually committed those clinical errors. And the court in that case, this court said that even if the court accepts that she committed those clinical errors, there's still a dispute of fact as to whether or not those clinical errors actually motivated her termination. There's another reason there's a dispute of fact as to pretext is because Ms. Isaac made comments and took targeted actions pertaining to Ms. Crosley's age and disabilities. Discriminatory remarks can serve as probative evidence of pretext, even when those remarks do not coincide exactly with the specific events that generated the claim of discriminatory treatment. In determining the significance of discriminatory remarks, courts must evaluate factors affecting the statement's probative value, such as the declarant's position in the employer's hierarchy, the purpose and content of the statement, the temporal connection between the statement and the challenged employment action, as well as whether the statement supports other evidence of pretext. And the district court improperly considered only the temporal connection in dismissing Ms. Crosley's argument. In Bartlett v. Gates, this court held that a decision maker's comments that 34 years on the job were enough and suggestions that plaintiffs should retire constituted evidence of discriminatory animus, even though those comments were not directly related to the decisional process. In Bledsoe v. TVA, this court found that comments encouraging a disabled employee to take medical leave were sufficiently probative to establish pretext as well. Here, Isaac made four discriminatory comments. She encouraged Ms. Crosley to retire. She sought to prevent Ms. Crosley from using disability parking and threatened to report Ms. Crosley over that use. She insisted that plaintiffs take a leave of absence to treat of cancer, and she expressed doubt that plaintiffs could do her job because of her disability. When you look at all these facts taken together, there is a genuine dispute of fact as to pretext. Which one of those four was the closest to the time of the termination, and how close was it? The closest one to her termination was when Ms. Isaac expressed doubt that plaintiffs could do her job because of her disability, and that one was about six months prior to her termination. There's an email. I believe it's cited, too, in the briefs. Thank you. Thank you, Your Honors. Mr. Pepper. Thank you, Your Honor. Good morning, Your Honors and Ms. Nelson. May it please the court, I'm Tim Pepper, arguing on behalf of Apelli's Healthcare and Belinda Isaac individually. What's not in dispute, I believe, in this case, is that plaintiff engaged in a pattern and practice of violating her employer's expectations regarding the handling of confidential patient information. I don't think that's really in doubt. There can be arguments about whether or not it violated HIPAA technically or not. I think, clearly, Kettering has the better of those arguments, but as the court has observed, the honest belief doctrine, I think, would foreclose that argument. The fact of the matter is plaintiff did access these records as described in the briefings. Her employer did an investigation. Her employer did conclude that that conduct was wrongful and fired her for that conduct. She says that she wasn't violating HIPAA. You say that there's no dispute. Is your bottom line position that she was fired for insubordination? She was fired for two reasons. She was fired for repeatedly violating Kettering's HIPAA policies and also for insubordination. The two go together because even if we take plaintiff's word at face value that she did not understand or maybe she finds ambiguity in what was expected of her regarding HIPAA, the fact that she was specifically warned on more than one occasion, this conduct you're engaged in, stop it. The fact that she was warned that whatever ambiguity that she might have perceived was clarified for her on multiple occasions, and she persisted anyway in that course of time. If I could just to understand the fact, she was warned repeatedly. Was it not by a lower level records type person as opposed to an official warning in writing or otherwise? The evidence in the record is that the person who made the initial warning to her was a member of management and Ms. Crossley in her deposition acknowledged it. Can you give that name of that person? I'm sorry. I'm drawing a blank. If you give me just one second, I don't have it. I'm sorry. I'm drawing a blank. Wasn't it a passing conversation in the hallway? It was the administrative manager, I thought, of the speech therapist center. It was. The meeting in which it occurred, yes, it was not a scheduled planned meeting. It was an impromptu conversation, but nevertheless, the information was conveyed to Ms. Crossley that what she was doing was not permitted. At that point, she had been told by a member of management what she was doing was not permitted. She testified in her McConnell. I'm sorry. The answer is Deborah McConnell. Was McConnell a member of management? Yes, Your Honor. That's in the record. That's admitted by Ms. Crossley in her deposition. She was a member of management. She was not in the supervisory line above plaintiff, but that she was a member of management in plaintiff's work unit. She advises plaintiff that what plaintiff is doing is against carrying policy and she's supposed to stop. Whether or not plaintiff wanted to believe Ms. McConnell or not, and clearly she didn't want to believe her, at least at that point, plaintiff was on notice. Hey, management, someone in management thinks that what I'm doing is wrong. She testified in her deposition. She made no effort to ask anyone else. She made no effort to go review Kettering's HIPAA policies, which were available to her online. She made no effort to go back and review the training materials for the training she received at HIPAA. Instead, she just decided for herself that she knew more than Kettering's management about what Kettering's... What was the next time she was warned? I was a little unsure of what the record showed on this, so I recognize that instance. Is the next one the formal meeting? They confront her with the 47 alleged unauthorized accesses of patient information? Yes, your honor, that's correct. That meeting occurred late in the week and she was in no uncertain terms told in that meeting that what she was doing was not permitted. And then right after that meeting in the following days, she went and did it again. Did she do it only once again? She did it on one occasion. I don't recall if she viewed more than one patient record on that occasion. On one occasion after that, she did it again. It was within a couple of days after being told to stop doing that. And my understanding was that that was then defended by her on the and that she said that he had asked for her help and she pulled up the chart for teaching purposes. I believe that is what she said. Mr. Anbach, when he was deposed, flatly denied that and said that's not what happened at all. And even more importantly, she was not tasked by Kettering in an instructional role. She was not tasked to teach anything at that point. So you have Kettering saying, no, that wasn't her job. You have the other therapist saying, that's not even what happened. No, I did not go ask her for help and she had no reason to get into the patient files of mine. But she gives sworn testimony, right? Correct me if I'm wrong. Isn't her testimony also sworn? So you have a fact question between her view that she was teaching Anbach or helping Anbach with this particular patient and Kettering and Anbach's statement. That's correct, Your Honor. She testified that her view, her understanding of what she was doing is as you've described. Her testimony was that she understood that she had taken it upon herself to get into his files to engage in instruction with him. For purposes of this appeal, don't we have to take that as a given then because of the standards for summary judgment? That question of fact, that narrow question of fact we identified here in the last few minutes does not create an overall question of fact that would warrant a trial in this case. That question of fact is whether or not she agrees with management that her conduct is a violation of policies or not. Whether or not she agrees with management that her conduct is a violation of policies is not the issue. The issue is did management conclude that her conduct was a violation of policies and if so terminate her for that? One of the reasons why this is not a question of fact that requires a trial is that there is no question of fact in this record that Kettering has ever not terminated someone for doing what Ms. Crossley did. There is zero evidence. But is there any evidence in the record that it's ever terminated other people? Isn't there isn't the record just silent on this point? I mean you have Sheldon's affidavit that suggested in negative nobody's not been terminated for this type of conduct. But I don't believe Kettering has actually identified any other employees who have ever been formally terminated for violating for accessing patient records without unsufficient reason. I believe, I don't have it in front of me, I believe Sheldon's affidavit does say that this is a terminable offense. Kettering's own policies state that this is a terminable offense. I do believe there's evidence in the record. I don't think we have the names of the other people, but I believe there's evidence in the record that this is an offense that Kettering terminates employees for. This kind of large-scale HIPAA violations, whether or not the employee agrees with management that they have violated HIPAA or not, the underlying conduct is what motivated Kettering to take the action that it did. Now your opponent has made a major part of her argument that your reasons, the employer's reasons, were changing over time as to what particular policy was violated. Is that in fact true? And if it is, why isn't that a problem for your side? I don't believe it's true. As the court has observed earlier in this argument, Kettering has consistently, from day one, explained that the termination was because of the conduct that we've been discussing here, the unauthorized access to patient records. There are multiple policies at Kettering that touch on that, and those are the policies that have been discussed in discovery and discussed in motion practice. The fact that there are multiple policies that can be pointed to to have some bearing on this question, so for example, a policy that prohibits the conduct, there's another policy that provides for, okay, well, what are the consequences of this kind of violation? The fact there's multiple policies that address the issue doesn't mean that the reason for the termination, which is her conduct, is not the actual reason. I don't believe there's any evidence to suggest that Kettering was not motivated by the reason they gave, which was her conduct. And when you have multiple policies that can be identified as having some bearing on the issue, so they're all identified, that does not turn a clear pattern of misconduct into all of a sudden debatable. Kettering has been consistent from day one without fail. If she was terminated for repeatedly accessing patient information, we shouldn't have a reason to do so, and then for insubordination for refusing to take management's directives about that specific issue. Can I ask you another component of your friend on the other side's case is the general rule of progressive discipline, which means you don't usually bring the hammer down the first time, so to speak. I would understand exceptions to that rule for incredibly egregious misconduct, you know, theft or committing crimes or, you know, batteries or things of that. Now, obviously, those would be punishable by termination after the first offense, but what's the best evidence for why this type of unauthorized access of patient records would qualify for that type of, you know, the most significant discipline? Is it Sheldon's affidavit? Is there anything else in the record that would bolster the idea that this is an egregious misconduct that warrants immediate termination? Well, I think the record is replete with evidence that despite being warned to stop doing this, plaintiff continued to do it anyway. So, you have a large number of patient files that were accessed without authorization. Plaintiff was specifically told, this is a violation, stop it. She continued on doing it anyway. So, you've got the large number of violations plus the insubordination and just refusing. Why wouldn't that warrant just progressive discipline, put a suspension or a two-week suspension or something in a personnel file? What is the evidence that suggests that that type of insubordination on this accessing patient information warranted termination, immediate termination? Hospitals routinely fire people for much fewer HIPAA violations than this. Kettering fires people. This is not in the record. I understand that. I can tell you from other cases I've litigated on behalf of Kettering, I've never seen a HIPAA violation this bad. This is the kind of thing that a Kettering, as Ms. Sheldon testified in her affidavit, if they had not fired her, Ms. Sheldon, who's responsible for HIPAA compliance, would have taken it up the chain to the vice president level that that. So, just to answer the question, the affidavit is the main thing you would point to? On the question of why was this a terminable offense versus a discipline offense? Yes, I say Ms. Sheldon's affidavit is the main piece of evidence in that regard. Thank you. Here, your opponent has mentioned the comments of Ms. Isaac and four different situations, which arguably suggest age and disability motivation here. Why does that not produce a fact question that would preclude summary judgment? Because the comments are so attenuated in time, and they're not even as portrayed in Ms. Crossley's brief. So, if we just Belinda Isaac, who was plaintiff's direct supervisor, commented to plaintiff that she'd prefer she not park in the handicapped parking spots right in front of the front door to the clinic. Plaintiff pushed back and said, well, I want to park there. So, Ms. Isaac went to HR and checked into it and found out they couldn't stop her from parking there. And so, okay, that was it. That's the sum total of that issue. She was never instructed not to park there. The record contained evidence that she was told, I'm afraid not park there. And when it became a dispute, Ms. Crossley's position prevailed, and that was that. Also, two years before the termination decision, the record contains Ms. Crossley's recollection of a conversation with Ms. Isaac. Ms. Isaac would dispute the version of events, but if we take Ms. Crossley's version of events just at face value, it does not show age-biased comments. And I'm reading right now from page three of a Pelley's brief. Quote, defendant Isaac asked me if I did, defendant Isaac asked me, when did I plan to retire? Didn't I want to retire? Wouldn't I want to spend more time with my grandkids? End quote. That's the sum total of that alleged age-biased comment, was a conversation between two women of roughly the same age in a break room over lunch about their future plans and retirement, spending time with their grandkids. That kind of innocuous conversation two years prior to the termination is not evidence of age bias. The other two things, there's no evidence in the record that Ms. Isaac insisted that plaintiff take a leave of absence. Ms. Isaac, as she had multiple times before, offered a leave of absence to plaintiff. Plaintiff had taken a leave of absence before for her conditions without incident. Ms. Crossley concedes in her testimony the prior leave of absence, no issue at all. So the fact that they had a conversation about that again is not evidence of discrimination. And then the fourth one, well, the after the fact text messages, there's these text messages about two years after the if the court were to look at the affidavit of Teresa Holman, which is in the record, it's attached to the plaintiff's memo and option of motion for summary judgment. Ms. Holman, who's not in member management, testifies that someone else, not a member of management, told her, so it's classic law school hearsay, that there was nothing in plaintiff's of desire to rehire her and therefore evidence of pretext. I have one last question if I could ask on the feature about catering people coming and inviting Crossley to apply for a job as a speech pathologist. And does that not show that the reasons for the firing were pretextual? How do you respond to that? So the only evidence on the record regarding that text message is the affidavit of Teresa Holman. It's attached to plaintiff's memo and option of motion for summary judgment. In that affidavit, what Ms. Holman says is that she is a former employee of catering, not in management. It says that she communicated with the recruiter who sent the text message that we're talking about. It doesn't say the recruiter was in management because she wasn't. And what it says is that the recruiter communicated to me that multiple people received this text message, which is true, it was a blast text message out to many, many people. She vetted the list of recipients of this text message through catering's internal systems and there was nothing in Maryland's plaintiff's file regarding her reason for termination. That's it. So what this affidavit says is two people who are not in management communicated and one said to the other that, well, I sent that, I put Maryland on the list to get that text message because I didn't see anything in her personnel file that gave her a reason for termination. So therefore, I thought it'd be okay. But there was an indication that she'd been terminated. Yes, yes. She had been terminated. There's no question about that, but there was not a reason in her personnel file that would indicate a disqualification. It would seem arguably suspicious for an employer to be seeking out people that they had terminated, regardless of whether it was for theft or lying or hitting a patient or whatever the reason would be. It seems improbable that somebody would seek to re-employ such a person. So I want to clarify something I said. Maybe I was not clear. Her personnel record shows that her employment terminated. It does not show that she was fired for misconduct. And that's what I think this affidavit is saying, that the file does not show the reason for the termination of her employment. It just shows that she's no longer employed. And so what my understanding is what if there's not something in the file that would make them disqualified for re-employment, they get blast messages, hey, you want to come back? Okay, so maybe this is a terminology problem. When it shows, and I need to look at the record, obviously, it shows that she ended her employment is different in my mind from shows that she was terminated. And you're saying it was the shows that her employment ended, as opposed to that it shows that she was terminated. Yes, Your Honor. And if the court were to look at Exhibit 11 to the deposition of Ms. Sheldon, that is a document called the Employee Conduct and Discipline Record. So it's Exhibit 11 to the Ms. Sheldon deposition. And this is the document that states that plaintiff was terminated, and it states the reasons why. So if this had been in the file, then this would have been something the recruiter would have seen and said, all right, well, we're not going to add this person to the list to try to recruit back to the network, right? This document was not in the file, apparently, at least that's the evidence from the record, this document is not in the file. And so this document is not in the HR file. Recruiter knows this is a former employee, doesn't know under what circumstances she became a former employee. Thank you. Any further questions? Thank you. Thank you, Your Honor. Rebuttal. Thank you, Your Honors. We've hit on a lot of points this morning. I think that mostly what's demonstrated is that there is certainly a genuine dispute of material fact as to whether or not Kettering's proffered reasons for termination actually motivated Ms. Crossley's termination here. So Ms. Crossley has demonstrated that she deserves her day in court here and these issues should go to a jury. And we therefore respectfully request that this court reverse and remand the district court's decision. Any questions? Thank you. Thank you both for your argument and the case will be submitted.